## MATTER OF CINDY LOU SMITH

[No. 497, September Term, 1972.]

*Per Curiam September 27, 1972.*

*Opinion Filed October 5, 1972.*

210

## PER CURIAM

Those portions of the Order dated 26 September 1972 of the Circuit Court for Kent County sitting as a Juvenile Court finding that Cindy Lou Smith is a child in need of supervision who requires guidance, treatment, or rehabilitation within the provisions and intent of Md. Ann. Code art. 26, and ordering that she be placed in the custody of her mother, Mary Esther Cain, under the supervision of the Department of Juvenile Services, subject to further Order of the Juvenile Court are affirmed.

Those portions of said Order ordering as a special condition that Cindy Lou Smith shall obey her mother in submitting to the medical procedures at Easton Memorial Hospital to terminate her pregnancy and that the request and instructions from her mother shall be sufficient authority for any medical doctor or hospital to provide this treatment and Ordering that Cindy Lou Smith shall be retained by the Sheriff of Kent County, who shall deliver her to Easton Memorial Hospital, at the request of her mother, Mary Esther Cain, are reversed.

An opinion of this Court will be hereinafter filed.

> *Order affirmed in part, and reversed in part.*
> *Mandate to issue forthwith.*

The cause was argued before MORTON, ORTH, THOMPSON, CARTER, GILBERT and MENCHINE, JJ.

*John W. Sause, Jr., District Public Defender,* for appellant.

*Richard R. Cooper, State's Attorney for Kent County,* for appellee.

ORTH, J., delivered the opinion of the Court.

On 26 September 1972 the Circuit Court for Kent County sitting as a juvenile court (the Juvenile Court) adjudged that Cindy Lou Smith (appellant) was a child in need of supervision and ordered that:

    (1) she be placed in the custody of her mother under the supervision of the Department of Juvenile Services subject to the further order of the Juvenile Court;

    (2) as a "Special Condition", she "shall obey her Mother in submitting to the medical procedures at Easton Memorial Hospital to terminate her pregnancy", declaring "that the request and instructions from her Mother shall be sufficient authority for any medical doctor or hospital to provide this treatment";

    (3) she "shall be retained by the Sheriff of Kent County, who shall deliver her to Easton Memorial Hospital, at the request of her mother."

Appellant noted an appeal the same day and the Juvenile Court stayed its order pending a hearing on the appeal. We heard the appeal on 27 September. The same day we affirmed the adjudication that appellant was a child in need of supervision and affirmed that part of the order designated above as (1). We reversed those parts of the order designated above as parts (2) and (3). Mandate was issued forthwith. We now state the reasons for our decision.

### (1)

Appellant, 16 years of age, was brought before the Juvenile Court on the petition of her mother, Mary

Esther Cain.[1] Art. 26, §§ 70-2 and 70-6; Maryland Rules 901, 902, 903. The petition, filed 21 September 1972, alleged that appellant was a child in need of supervision for the reason that on "September 14, 1972 * * * [she] did leave school without consent of her parent and stayed away from school until September 21, 1972." It seems that the petition was amended to include as a further reason "that she is pregnant." Rule 905. The same day the court authorized that she be placed in detention and directed the Sheriff. of Kent County to keep her in his custody pending further hearing. Code, Art. 26, §§ 70-11 and 70-12. An adjudicatory hearing was held on 25 September. Code, Art. 26, § 70-17; Rule 912. Appellant's mother testified that Cindy was 16 years of age. She was asked what was the relationship between Cindy and Douglas Earl Nicholson and replied: "I really didn't think they were seeing one another." She explained that "Cindy was punished for a whole month and she wasn't allowed out even on weekends, and that's because of Doug. * * * She was to go to the movies, and I found out the next day she didn't go to the movies at all, and she happened to be with Doug. And when I questioned her she said she had went to the movies, but I found out she didn't, so I punished her for a month." On 14 September Mrs. Cain received a telephone call from Cindy's school and was told that Cindy "had signed herself out, that she had a doctor's appointment." Mrs. Cain then telephoned Doug's mother. "I told her I didn't think the kids were in school, that Mr. Newman [2] had just called me, but Mr. Newman couldn't find out whether Douglas was in school or not." She next saw Cindy a week later at the jail. It was adduced that Cindy had run away a year before with Doug and Mrs. Cain had forbidden her to see him. It was when she found out they were still dating that she punished Cindy. Mrs. Cain

---

1. Cindy's father was deceased and her mother had remarried, the present husband being William E. Cain, Jr.
2. Mr. Newman was not identified but apparently he was connected with the school.

learned on 11 September that Cindy was pregnant. Cindy said Doug was the father. Mrs. Cain told her daughter that "I would like for her to have an abortion." On cross-examination it appeared that Mrs. Cain had been told by her sister-in-law that Cindy had made an appointment with a Doctor Farr. Mrs. Cain went to the doctor's office and met Cindy there. The doctor said Cindy was pregnant. Mrs. Cain and the Doctor and Cindy discussed an abortion, and Cindy said she did not want one. Mrs. Cain said: "I talked to Cindy and I didn't seem to be getting anywhere one way or another. So I called the Health Center and I asked for someone there to talk to her, and I took her in there on a Wednesday morning [13 September] at 10:30. * * * Mrs. Betty Davis talked to her for about an hour. I was there during half the conversation and then Mrs. Davis talked to her by herself. * * * When we left the building I told Cindy I had to do some shopping, so I went to Leggett's and she wanted to go in and I asked her to sit in the car and think. And I was gone about 45 minutes and when I came back and started to go to Rock Hall she told me to call Dr. Farr, that she had decided to have an abortion." Mrs. Cain took "steps to arrange" for Cindy to have an abortion.

Cindy testified that she first met Douglas Earl Nicholson about two years ago and was in love with him. Dr. Farr told her she was pregnant. She said she did not want to be aborted. She was asked her reasons and objection to the question was sustained, the court stating:

"I think that is pretty well established anyway, Mr. Parks [appellant's counsel]. The reason for her running away she says is because she didn't want an abortion. You can argue that, whether you think there is some basis in the law giving a child the right to run away from home because she is pregnant and doesn't want an abortion. I think the facts are established that she is pregnant and that she ran away from

home because she didn't want an abortion. I think we have enough on that."

Cindy said there was no other reason for her leaving home than that she didn't want an abortion. When she found out she was pregnant she and Doug planned to get married. When they left on 14 September two friends took them to Centreville and then they hitchhiked to Kentmore Park. They spent the night at "a couple of friends' house." On Monday morning they hitchhiked to Tolchester and remained until the police picked them up. On cross-examination she said Doug "got her pregnant" and on redirect she reiterated that the only reason she ran away was "because me and Dougie didn't want to have an abortion."

Douglas Earl Nicholson testified that he was also 16 years of age, his date of birth being 12 July 1956. His version of what happened on 14 September and the days following until the police arrived was the same as that of Cindy, and his reason for running away was the same. "Because Cindy's mother wanted her to have an abortion and Cindy and I didn't want for her to get an abortion. * * * Well we figured that if we stayed away long enough so that she couldn't get an abortion then her mother couldn't make her get an abortion." He gave another reason. "Well, we figured—we went to Centreville to see if we could get married and they said we couldn't." He had asked his parents to let him marry Cindy and "they said they wouldn't sign." He said he was the father of Cindy's "child-to-be."

The court found that Cindy Lou Smith was a child in need of supervision within the contemplation of the Juvenile Causes Act. A child is a person who has not attained 18 years of age. Code, Art. 26, § 70-1 (c). Section 70-1 (i) states that a child in need of supervision means:

"(1) Subject to compulsory school attendance who is habitually and without justification truant from school;

(2) Without substantial fault on the part of

his parents, guardian, or other custodian, who is habitually disobedient, ungovernable, and beyond their control.

(3) Who so deports himself as to injure or endanger himself or others; or

(4) Who has committed an offense applicable only to children; and

(5) Requires guidance, treatment, or rehabilitation."

That a child is in need of supervision must be established by a preponderance of the evidence. Code, Art. 26, § 70-18 (c). It was not disputed that Cindy was a "child" within the definition of the Act and that she was pregnant as alleged in the petition. We think the evidence was sufficient in law to show that Cindy deported herself so as to endanger herself. Not only had she become pregnant but she had twice run away from home. The last time she hitchhiked on the highways with a 16 year old boy, first from Centreville to Kentmore Park where they spent the night with friends, and then to Tolchester. Where they spent the nights in Tolchester until they were found by the police is not clear. Having so deported herself it is patent that this 16 year old, pregnant, unmarried girl required guidance and treatment, particularly in light of a declared purpose of the Juvenile Causes Act "to provide for the care, protection and wholesome mental and physical development" of children coming within its provisions. Code, Art. 26, § 70 (1). The evidence being legally sufficient to prove that Cindy Lou Smith was a child in need of supervision as alleged in the petition, the Juvenile Court was not clearly wrong in its judgment that she was. Rule 1086. Therefore we affirmed the determination that Cindy Lou Smith was a child in need of supervision.

### (2)

A disposition hearing followed hard on the heels of the adjudicatory hearing. Code, Art. 26, § 70-17; Rule

913. Code, Art. 26, § 70-19 (a) authorizes the court to make such disposition of a child found in need of supervision as most suited to the physical, mental and moral welfare of the child. On the evidence adduced we see no abuse of this discretion in the placing of Cindy in the custody of her mother, under the supervision of the Department of Juvenile Services subject to the further order of the court. Therefore we affirmed the order of the Juvenile Court in that respect.

(3)

It was the opinion of the Judge below that a 16 year old child did not have "any particular and special rights in derogation of their parents * * * with respect to the abortion law and the medical laws." He continued:

> "It was to encourage children not to have unplanned for families, and it was to encourage children to go to doctors, and hospitals or clinics to handle the venereal disease problem, which is becoming an ever-growing problem. It seems to me it is philosophy. I can't read into it they have a right to consent and therefore they have a right to object, because the philosophy back of it is to get medical assistance to the people and prevent these unfortunate social consequences, of early, promiscuous sexual conduct on the part of young people who are totally incapable of dealing with these problems."

The Judge stated that he was not operating under Code 43, subtitle "Abortion", but under Art. 26, the Juvenile Causes Act. He said:

> "I think that the Court can certainly support parents in doing what they think is best for the child. If Mrs. Cain thinks it is best for her child to have some medical procedure to terminate the pregnancy—if she withheld it and the Court found it was against the interest

of the child the Court could order it, in my opinion. We don't have the mother refusing the medical procedure, we have her desiring the medical procedure and the daughter refusing to obey her mother's orders."

The court then recalled the mother to ascertain "what her desires are and what the medical possibilities are." The transcript of her testimony reads in relevant part:

"Questions by Mr. Cooper [State's Attorney]:

Q. Now, in contemplation of your daughter having an abortion, have you made any arrangements with any doctors?

A. Yes.

Q. What arrangements have you made?

A. She is supposed to be at Easton on Wednesday morning.

Q. Who is her doctor?

A. I can't remember his name. I think it is Johnson, I am not sure.

Judge Rasin: By Easton do you mean the Easton Memorial Hospital?

A. Yes.

Q. At Easton Memorial Hospital in Easton, Md.? What time?

A. I can't remember. One was 10:30. I think this was 10:45.

Q. And the abortion was to be performed at that time?

A. Yes.

Judge Rasin: Who made those arrangements? Through Dr. Farr?

A. No, I made them.

Judge Rasin: And it is still your desire that Cindy Lou be aborted of this pregnancy?

A. Yes sir.

Judge Rasin: When you talked with Dr. Farr you say it was on the 11th of September?

A. It was Monday a week ago.

Judge Rasin: And Dr. Farr examined Cindy Lou?

A. Yes.

Questions by Mr. Parks [appellant's counsel]:

Q. Do you know whether or not, within your knowledge, the Easton Memorial Hospital Board has met and approved her having an abortion?

A. No, I don't.

Q. Do you know whether any other doctor has examined her other than Dr. Farr?

A. I don't think so.

Q. Do you know whether or not she has seen any psychiatrist or psychologist?

A. Not to my knowledge she hasn't.

Q. Yet the abortion is planned for the 27th, which is two days from now?

A. Yes sir. If it is to be done she has a very limited time.

Q. Do you know how far pregnant she is?

A. She is due in April.

Q. Normally she would have gotten pregnant in July?

A. Yes.

Q. This would be approximately 8 or 10 weeks then?

A. Yes.

Q. You say she has been pregnant, as far as you know, about 10 weeks?

A. Approximately.

Q. She has a maximum of 16 weeks under the statute.

A. Dr. Farr, when he explained it to me, said the sooner the better.

Q. Do you have any evidence in your own personal knowledge that the continuation of this pregnancy would greatly impair the health—

Mr. Cooper: I object.

Judge Rasin: Sustained.

Q. Do you have any evidence within your own personal knowledge that there is or is not any substantial risk on the birth of the child, of any physical deformity or retardation?

Mr. Cooper: Objection.

Judge Rasin: Sustained.

Q. Do you have any evidence that Easton Memorial Hospital is a hospital accredited by the joint commission of hospitals and licensed by the State Board of Health and Mental Hygiene?

Mr. Cooper: Object.

Judge Rasin: Sustained. I think the Court will take judicial notice of that fact.

Q. Knowing what you have heard today and understanding that your daughter is violently opposed to having an abortion do you still want her to have one?

A. I don't see any other way out, sir.

Q. That is not answering my question.

Judge Rasin: I think it is.

A. I am here because I don't want to force Cindy. I am here for help.

Q. If you knew she were violently opposed would you make her go through with it?

Mr. Cooper: Objection.

Judge Rasin: Overrule. Answer the question.

A. Would you repeat it?

Judge Rasin: The question is, would you still want her to have the abortion in the face of her strenuous objection?

A. Yes sir.

Judge Rasin: You would not change your mind?

A. No sir.

Mr. Cooper: Do you feel you will need the aid of the Court to get her to the hospital?

Mr. Parks: Objection.

Judge Rasin: I think that is obvious."

The judge summed up his feelings:

"I do not believe that any child who is 16 years of age has the right to disregard her parents' control and supervision and do as she desires and then force the parent to do what that child wants to do herself. Statistics and experience certainly show that children who are born under these circumstances have many difficult days and it is usually left up to a social agency or the grandparents to take care of the child. The Court does not believe it is in the interest of an unborn child to be born under these circumstances. I am well aware of the romance and unreasonable response, particularly on the part of young people in this type of situation, which is completely unrealistic as to who is going to support them, how they are going to live, where they will find a job. Because again, I have been on the Bench long enough in this County to see these cases end up right back in Court * * * So I have no hesitancy at all in supporting Mrs. Cain in this case, and directing that she obey her mother, and that she submit herself to the medical procedure of abortion that has been arranged by Mrs. Cain."

He explained what he was doing:

"Now what I am doing, I want the record and everybody else to clearly understand, I am merely supporting the mother, who is the natural guardian, and the only natural guardian of Cindy Lou Smith, in her plans to deal with her child in a manner which she deems is in the best interest of her child and really of the unborn child, and I support her 100%. I feel this is indeed a practical way to deal with this problem, considering the age of these two young people."

The order here appealed from was passed. As a "Special Condition" it was ordered "that Cindy Lou Smith shall obey her Mother in submitting to the medical procedures at Easton Memorial Hospital to terminate her pregnancy and that the request and instructions from her Mother shall be sufficient authority for any medical doctor or hospital to provide this treatment." To implement this "Special Condition" the court further ordered, despite that it had placed the child in the mother's custody, "that Cindy Lou Smith shall be retained by the Sheriff of Kent County, who shall deliver her to Easton Memorial Hospital, at the request of her Mother, Mary Esther Cain."

"The father and mother are the joint natural guardians of their minor child and are jointly and severally charged with its support, care, nurture, welfare and education." Code, Art. 72 A, § 1. The guardianship devolves upon the surviving parent. Ibidem. Medical care is embraced within the scope of the broad language of the statute. *Craig v. Craig,* 220 Md. 590.

Abortion was dealt with by Ch. 470, Acts 1968, codified as Art. 43, §§ 137-139.[3] Section 137 provides that only a physician licensed by the State of Maryland in a hospital accredited by the joint commission for accreditation of hospitals and licensed by the State Board of Health and Mental Hygiene may terminate a human pregnancy otherwise than by birth and then only if one or more of the following conditions exist:

"(1) Continuation of the pregnancy is likely to result in the death of the mother;

(2) There is a substantial risk that continuation of the pregnancy would gravely impair the physical or mental health of the mother;

(3) There is substantial risk of the birth of the child with grave and permanent physical deformity or mental retardation;

3. Ch. 736, Acts 1970 renumbered former §§ 149E-149G as §§ 137-139.

(4) The pregnancy resulted from a rape committed as a result of force or bodily harm or threat of force or bodily harm and the State's Attorney of Baltimore City or the county in which the rape occurred has informed the hospital abortion review authority in writing over his signature that there is probable cause to believe that the alleged rape did occur."

And in no event shall any physician terminate a human pregnancy unless not more than 26 weeks of gestation have passed (except when continuation of the pregnancy is likely to result in the death of the mother or where the fetus is dead) and authorization therefore has been granted in writing by a hospital abortion review authority appointed by the hospital. Code, Art. 43, § 137 (b).

We do not construe the order of the Juvenile Court as directing that an abortion be performed. Clearly here such mandate would be beyond the power of the Court; termination of a human pregnancy can be authorized only by the abortion review authority appointed by an accredited hospital. Further the legislature made clear that no person shall be required to perform an abortion and no hospital shall be required to permit an abortion to be performed in its institution. Code, Art. 43, § 138. As we interpret the order, the court, satisfied that Cindy's mother desired her daughter to be aborted, commanded the daughter to obey her mother by submitting to such procedures as would ascertain the existence of a condition permitting a legal abortion so that the required authorization of a proper hospital abortion review authority could be obtained and the pregnancy terminated. Patently there was no evidence before the lower court sufficient to establish that one of the requisite conditions in fact existed and that the necessary hospital authorization had been given. The question is whether, for reasons not within the ambit of the abortion statute, a parent having the custody of a minor daughter who has attained the age of 16 years may compel that child over

the child's opposition to submit herself to procedures which may lead to an abortion. We do not think it was the legislative intent that a parent have this power. The statute expressly provides that no person shall be required to participate in medical procedures which result in the termination of pregnancy and the refusal of any person to do so shall not be a basis for any recriminatory action by the State or any person. Code, Art. 43, § 138 (a). And it sets out in unambiguous language that the "refusal of any person to submit to an abortion or to give consent therefor shall not be grounds for loss of any privileges or immunities to which such person would otherwise be entitled * * *." Id., § 138 (c). When a minor child is involved, as is here the case, these provisions must be read in conjunction with Code, Art. 43, § 135, dealing with a minor's capacity to consent to medical treatment. First enacted by ch. 468, Acts 1967, the statute was rewritten in ch. 758, Acts 1971, to provide that "a minor shall have the same capacity to consent to medical treatment as an adult" if one or more designated conditions apply. The conditions set out are:

"(1) The minor has attained the age of eighteen (18) years.

(2) The minor is married or the parent of a child.

(3) The minor seeks treatment or advice concerning venereal disease, pregnancy or contraception not amounting to sterilization.

(4) In the judgment of a physician treating a minor, the obtaining of consent of any other person would result in such delay of treatment as would adversely affect the life or health of the minor.

(5) The minor seeks treatment or advice concerning any form of drug abuse as defined in § 2 (d) of Article 43B of the Annotated Code [Comprehensive Drug Abuse Control and Rehabilitation Act]." [4]

4. Section 135 A (a) of Art. 43 empowers a minor who has at-

Under the conditions set out, the minor, having the same capacity to consent as an adult, is emancipated from the control of the parents with respect to medical treatment within the contemplation of the statute. We think it follows that if a minor may consent to medical treatment as an adult upon seeking treatment or advice concerning pregnancy, the minor, and particularly a minor over 16 years of age, may not be forced, more than an adult, to accept treatment or advice concerning pregnancy. Consent cannot be the subject of compulsion; its existence depends upon the exercise of voluntary will of those from whom it is obtained; the one consenting has the right to forbid. And we feel that "medical treatment" within the meaning of the minor consent statute encompasses termination of pregnancy within the contemplation of the abortion statute. We find support in the law authorizing the marriage of minors for our conclusion that the legislative intent was that a female minor over 16 years of age is emancipated from the control of the parent with respect to matters concerning pregnancy. By the provisions of Code, Art. 62, § 9 (a) "A male over the age of 18 years or a female over the age of 16 years may marry without parental or guardian's consent, where required,[5] upon presenting a certificate from a licensed physician stating that he has examined the female and

---

tained the age of 16 years who has or professes to have a mental or emotional disorder to consent to diagnosis and consultation of the disorder by a physician or clinic, the consent in all respects having the same effect as if the minor had reached majority.

5. Other provisions of § 9 spell out when the consent of parent or guardian is required. Subsection (a) includes: "A male over the age of 18 years and under the age of 21 years, or a female over the age of 16 years and under the age of 18 years, may marry, with the consent of the parent or guardian, if the parent or guardian swears or affirms that the child or ward is over the age of 18 years or 16 years, as the case may be." Subsection (b) provides: "A male under the age of 18 years or a female under the age of 16 years may not marry except as allowed by this paragraph. Such a marriage shall be made only with the consent of the parent or guardian of the male under 18 years and/or the female under 16 years, as the case may be, upon the presentation of a certificate from a licensed physician stating that he has examined the female and positively ascertained that she is pregnant or has given birth to a child."

positively ascertained that she is pregnant or has given birth to a child."

The short of it is that the Juvenile Court did not have the power to compel Cindy to resort to medical procedures relative to a termination of her pregnancy on the ground that her mother wanted her to have an abortion. Therefore we reversed such parts of the order of the Juvenile Court which so compelled her.