**Kay B. JACKSON, Plaintiff,**

v.

**The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Defendant.**

Civ. No. 82–5079.

United States District Court,
W.D. Arkansas,
Fayetteville Division.

May 12, 1983.

John R. Elrod, Elrod & Lee, Siloam Springs, Ark., for plaintiff.

John R. Eldridge, III, Burke & Eldridge, Fayetteville, Ark., for defendant.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

This is an insurance coverage case in which the facts necessary for a determination of the issues raised are not greatly in dispute.

Plaintiff, Kay B. Jackson, is the widow of Jerry A. Jackson, who died on September 24, 1981, following open heart surgery which had occurred a few days before. On September 11, 1981, defendant Prudential's agent, James R. Hartley, had taken an application of insurance from the deceased for a decreasing term policy of $42,000.00. The application and circumstances surrounding its completion will be discussed in more detail below. At the time that the application was completed, the agent accepted from the deceased an initial premium of $24.91 and issued and delivered to the applicant a "temporary insurance agreement" which purported to provide temporary insurance in the amount applied for for a period beginning on the date of the receipt and ending when a permanent contract of insurance was issued, when the application was rejected by the company, or at the end of sixty (60) days if no policy had been issued and no rejection had been made prior to that time. Mr. Jackson died thirteen (13) days after the date of the temporary insurance agreement, and no policy had been issued nor had the application been rejected by the company.

After the death, the plaintiff made the necessary proof of loss, but Prudential refused to pay the face amount of the policy applied for, claiming that, at the time that the application was completed, the deceased had failed to disclose material information about his state of health at that time.

Suit was filed and the matter was tried to a jury on March 24, 1983. Both at the close of plaintiff's case and at the close of all of the evidence, the insurance company moved for a directed verdict on grounds discussed below. The Court took the motions under advisement and submitted certain issues to the jury by way of special verdict. The jury was asked the following questions, with the result indicated:

INTERROGATORY NO. 1: Do you find that there was a misrepresentation, omission, concealment or incorrect statement made by Jerry A. Jackson in the application for insurance for the policy in question?

| ANSWER: | _____ (YES) |
| | ___X___ (NO) |
| _3/24/83_ | _/s/ Michael P. Leavitt_ |
| Date | (Foreperson) |

INTERROGATORY NO. 2: If you have answered "yes" to Interrogatory No. 1 above, then answer this interrogatory:

Do you find that the misrepresentation, omission, concealment or incorrect state-

ment was either material to the risks involved, or that the defendant would not have issued the policy in question had the true facts been known?

ANSWER: _____ (YES)
_____ (NO)

_____     _____
Date                  (Foreperson)

Because the verdict, if accepted by the Court, would require that the Court enter judgment in favor of the plaintiff in the total amount sued for, the defendant insurance company filed what is denominated as a "motion for directed verdict and/or judgment notwithstanding the verdict." The Court requested simultaneous briefs, and received excellent briefs from both parties arguing their respective positions. The Court has now considered the issues raised and has reviewed relevant testimony in the case and is now prepared to rule.

As indicated above, the facts are not greatly in dispute. However, there is a great deal of dispute between the parties as to the effect of these "facts" when the applicable law is applied.

At the time of his death Mr. Jackson was 45 years of age. In approximately February of 1980, he saw Dr. Bob Weaver, a family practitioner, complaining of a burning below his rib cage. Dr. Weaver diagnosed his problem as a duodenal ulcer. It was Mr. Jackson's practice to take a daily walk with his wife, and some time in August, 1981, he noted a burning sensation in his chest. There is some dispute about whether that pain also radiated into his arm. In any event, the testimony is clear that his wife became concerned about him and insisted that he see a specialist. She called another member of their church, a Mr. Breese, who had had heart problems and had by-pass surgery, and he recommended that her husband see Dr. Robert Lynch, a Tulsa, Oklahoma, cardiologist.

He visited Dr. Lynch's office in Tulsa, Oklahoma, a distance of approximately 100 miles from his home, on August 31, 1981. During the physical examination which Dr. Lynch gave him, he had an electrocardiogram and stress test. The tests were abnormal, and Dr. Lynch advised Mr. and Mrs.

Jackson that he suspected that Mr. Jackson had heart disease, and he made an appointment for him to enter a Tulsa hospital on September 11, 1981, to have other tests, including a heart catheterization.

The Jacksons had recently purchased some real property on which they owed an indebtedness of $42,000.00. When they returned from Tulsa, they contacted James R. Hartley, who had been an agent for Prudential in the community for 14 years. Hartley and Jackson had been high school classmates and had known each other intimately for a number of years. Hartley testified that a few weeks before the contact which resulted in the application, the Jacksons had discussed with him the need for additional insurance because of an indebtedness that they had incurred at the time that the real property was purchased. He said that it was agreed that they would contact him when they were ready to proceed.

When Hartley was called after the Jacksons returned from Tulsa, it was agreed that he would visit them in their home on the evening of September 8, 1981. At that time he completed the application which was introduced as Plaintiff's Exhibit 1 at the trial. He testified that he asked Mr. Jackson each of the questions contained on the application and received answers from him. Although Mrs. Jackson was present in the room at the time, she testified that she did not listen to the discussion between her husband and Hartley and could not dispute any of Hartley's testimony.

The application which was completed at the time consists of two parts. In Part 1, a number of questions are asked, but only one question pertains to the physical condition or health of the applicant. That question is:

19. Has any person named in 1a or 6,      Yes   No
    within the last 12 months:

    a.  been treated by a doctor for or had a
        known heart attack, stroke or cancer
        other than of the skin? .......... ___  ___

    b.  had an electrocardiogram for chest
        pain or for any other physical complaint, or taken medication for high
        blood pressure? ................ ___  ___

Hartley testified that at the time that he read to Jackson question 19, Jackson answered: "As it is written there it would have to be No. I have had an electrocardiogram, but it was in a routine physical." The agent then checked question 19b. "No." Part 2 of the application contained a number of additional questions pertaining to the health and physical condition of the applicant. Question 6 of Part 2 asks, among other things, whether the applicant had, within the past five years, had electrocardiograms or other medical tests performed. When Agent Hartley reached this question, Jackson advised him that he had been to Tulsa a few days before and had seen Dr. Lynch. It was made known to Hartley that Lynch was a cardiologist and that he had given Jackson an electrocardiogram and stress test and that these tests had been abnormal. He was advised by Jackson that Jackson was to return to Tulsa within a few days for further tests. Hartley knew that Jackson had been referred to Dr. Lynch by Breese, who Hartley also knew, and that Breese had been treated by him for a heart condition which resulted in surgery.

When he was asked why he checked question 19b. "No" in the face of that knowledge, he said that it was because Jerry Jackson had told him "No" when the question was asked. On cross-examination Hartley testified that, while Jackson had told him that Lynch had done an EKG and stress test in Tulsa and that they were abnormal and that he was to go back for more tests, he did not advise him that the tests had been done for chest pains. He was asked:

Q. Did you even go further and ask him if a doctor had ever diagnosed him as having chest pain or heart disease?

A. I asked him pointblank "Have you ever been treated for or have you ever been told that you have heart problems." His response was "No."

In spite of this testimony, Agent Hartley unequivocally testified that he does not believe that the Jacksons in any way lied to him and that: "I don't believe Jerry would lie to anyone."

The application was completed as indicated and both parts were handed to the applicant to be signed. Hartley testified that he does not know whether Jackson read the application before signing it, but that it is not customary for most applicants to do so. After the application was signed by both Hartley and Jackson, Hartley then accepted the initial premium of $24.91 and completed and signed the temporary insurance agreement described above. It is uncontroverted that Hartley was authorized by the company to issue the temporary insurance agreement only if both questions 19a. and 19b. of Part 1 of the application were answered "No." Since both of these questions had been so answered, Hartley issued the agreement and accepted payment of the premium.

In the motion for directed verdict made both at the close of plaintiff's case and at the close of all the evidence, Prudential argued, among other things, that Hartley was a mere soliciting agent and that any knowledge that he had with respect to the health of the applicant was not imputed to the company. In addition, it was argued that there was not sufficient evidence to submit the matter to a jury and that a verdict should be directed in its favor for the reason that the plaintiff was not entitled to recover as a matter of law. In its brief in support of its motion for judgment notwithstanding the verdict, it contends that Hartley was a mere soliciting agent and that any knowledge that he acquired other than that contained in the application was not imputed to the company and, thus, that it is entitled, irrespective of the jury verdict, to avoid payment of the policy proceeds by reason of the provisions of Ark. Stat.Ann. § 66–3208, which provides as follows:

66–3208. Representations in applications.—(1) All statements in any application for a life or disability insurance policy or annuity contract, or in negotiations therefor, by or in behalf of the insured or annuitant, shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of

facts, and incorrect statements shall not prevent a recovery under the policy or contract unless either:

(a) Fraudulent; or

(b) Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or

(c) The insurer in good faith would either not have issued the policy or contract, or would not have issued a policy or contract in as large an amount or at the same premium or rate, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.

The Court will first address the question of whether the knowledge about Jackson's state of health may be imputed to Prudential since, if not imputed, it appears clear that there was not sufficient evidence from which a jury could have reached the conclusion reached by it. If there was a misrepresentation, omission, concealment of facts, or incorrect statement made by the applicant, it appears equally clear that it would have been material to the risk, an additional requirement of Ark.Stat.Ann. § 66–3208. In *Union Life Ins. Co. v. Davis,* 247 Ark. 1054, 449 S.W.2d 192 (1970), the Arkansas Supreme Court stated that this issue is a question of law when it is so obvious that a contrary inference is not permissible. In this case, it appears clear that, if there was such a misrepresentation, omission, concealment of facts, or incorrect statement, it would be material to the risk as a matter of law. In other words, if the Court determined that there was not sufficient evidence for the jury to have answered Interrogatory No. 1 as it did, the Court would have little difficulty reversing and dismissing the matter even though the jury did not answer Interrogatory No. 2 relative to materiality to the risk.

However, the Court has concluded that any knowledge which Agent Hartley acquired from Jackson during the preparation of the application for insurance is imputed to Prudential. Defendant earnestly con-tends otherwise, arguing that Hartley was nothing more than a soliciting agent and that, under Arkansas law, matters which a soliciting agent learns are not imputed to his principal. In support of this contention, Prudential cites: *Arkansas Mutual Fire Insurance Company v. Clark,* 84 Ark. 224, 105 S.W. 257 (1907); *Business Men's Assurance Co. v. Selvidge,* 187 Ark. 1040, 63 S.W.2d 640 (1933); *Commercial Standard Insurance Company v. Moore,* 237 Ark. 845, 376 S.W.2d 675 (1964); *Holland v. Interstate Fire Insurance Company,* 229 Ark. 491, 316 S.W.2d 707 (1958); and *Continental Insurance Companies v. Stanley,* 263 Ark. 638, 569 S.W.2d 653 (1978).

█ It then argues that Hartley had no discretionary power, but, instead, was authorized to perform only ministerial acts and, citing Appleman on Insurance §§ 8673 and 8691, argues that he was a soliciting agent and not a general agent. The Court agrees that Arkansas recognizes this distinction and has no difficulty in finding that Hartley was a soliciting agent, since he did not have the kind of authority required in order for him to have been considered to be a general agent, as those terms are defined by the *Appleman* article cited above and by *Holland v. Interstate Fire Insurance Co., supra.* He only had authority to solicit insurance and, under very limited circumstances, to issue temporary coverage, but he did not have the authority to accept risks, to agree upon the terms of insurance contracts, to issue and renew policies, and to change or modify the terms of existing contracts, authority required by *Holland, supra,* in order for an agent to be a general agent.

█ However, even though Hartley was a mere soliciting agent, the Court believes that Arkansas law, as announced by the Arkansas Supreme Court, clearly is that any knowledge obtained by him in relation to the questions asked on the application for insurance is imputed to the company. In arguing to the contrary, and in citing the cases listed above, the defendant fails to distinguish between knowledge obtained by a soliciting agent during the process of tak-

ing an application, and that obtained by him after the policy of insurance is issued. The Arkansas cases do make that distinction. The cases generally hold that the soliciting agent has authority to obtain information necessary to prepare an application for insurance, and that any knowledge obtained by him during that process relevant to the questions asked on the application is imputed to the company, but, on the other hand, that knowledge obtained by him after the policy is issued such as knowledge of a loss, knowledge of a change in use of the insured property, and notice of a claim is not imputed to his principal, since he had no authority, under his limited agency relationship, to accept these kinds of notice.

None of the cases cited by defendant in support of its position that the knowledge about Jackson's health obtained by Hartley in preparing the application is not imputed to Prudential involved questions of knowledge obtained during the application process. In *Arkansas Mutual Fire Insurance Company, supra,* the policy of insurance required that the insurance company be notified of a loss within sixty days. The Court held that notice given to a soliciting agent was not notice to the company.

*Business Men's Assurance Co., supra,* holds only that, where a policy of insurance requires notice in writing of an injury within a prescribed time, oral notice to a soliciting agent is not notice to the company.

The Court in *Commercial Standard Insurance Company, supra,* merely held that there is a distinction between the authority of general agents and special or soliciting agents and that a general agent has the power to reform a policy.

The policy of insurance involved in *Holland, supra,* was a homeowner's policy which contained a provision that the coverage was voided if the insured premises remained vacant for sixty days. After a loss, it was contended by the insured that the agent had been told that the premises were vacant. The Court discussed the distinction between general agents and soliciting agents and held that, since the soliciting agent had no authority to bind his company, and to extend coverage where coverage otherwise has terminated, his knowledge was not imputable to the insurance carrier.

The last case cited by defendant in support of its position is the *Continental Insurance Companies* case, *supra.* In that case, the policy covered, among other things, hail damage to certain crops, and required that written notice within 120 days of the loss be given to the company. The Court, again after discussing the distinction between soliciting agents and general agents, held that alleged notice to the soliciting agent was not notice to his principal.

Thus, it can be seen that, in each of the cases discussed above, the insured attempted to prove that certain requirements of an insurance policy already issued had been met by showing that a soliciting agent had been given the information required by the policy. Since, in effect, the policies voided coverage if these conditions were not met, and since a soliciting agent has no authority to waive any such requirements, or to reinstate or extend coverage where it has otherwise lapsed, the fact that the soliciting agent had received the information which the policy required be delivered to the company was not sufficient. In short, the cases cited by the defendant in support of its position do not support it.

On the other hand, however, there is a long line of Arkansas cases which hold that the knowledge obtained by an insurance agent, even a soliciting agent, in relation to information requested on the application while completing the application is imputed to the insurance company, or that the company is estopped from denying coverage where the agent obtained from the applicant the correct information. *Mutual Aid Union v. Blacknall,* 129 Ark. 450, 196 S.W. 792 (1917); *Springfield Mut. Ass'n v. Atnip,* 169 Ark. 968, 279 S.W. 15 (1926); *Massachusetts Bonding & Ins. Co. v. Chapman,* 176 Ark. 349, 3 S.W.2d 18 (1928); *Union Life Ins. Co. v. Evans,* 193 Ark. 627, 101 S.W.2d 778 (1937); *New Furniture & Undertaking Co. v. Tri-County Burial Club,* 194 Ark. 1045, 109 S.W.2d 146 (1937); *Callicott v.*

*Dixie Life & Accident Ins. Co.,* 198 Ark. 69, 127 S.W.2d 620 (1939); *Union Life Ins. Co. v. Johnson,* 199 Ark. 241, 133 S.W.2d 841 (1939); *Woodmen of the World Life Ins. Co. v. Sanders,* 201 Ark. 478, 145 S.W.2d 28 (1940); *Farmers Union Mut. Ins. Co. v. Hill,* 205 Ark. 139, 167 S.W.2d 874 (1943); *Southern National Ins. Co. v. Heggie,* 206 Ark. 196, 174 S.W.2d 931 (1943); *Aetna Life Ins. Co. v. Routon,* 207 Ark. 132, 179 S.W.2d 862 (1944); *Desoto Life Ins. Co. v. Johnson,* 208 Ark. 795, 187 S.W.2d 883 (1945); *Millers Mut. Fire Ins. Co. of Texas v. Russell,* 246 Ark. 1295, 443 S.W.2d 536 (1969); and *Reliable Ins. Co. v. Elby,* 247 Ark. 514, 446 S.W.2d 215 (1969).

The distinction between the first line of cases and the second is that in the second group the insurance agent, whether a general or soliciting agent, had been given authority by the company to obtain the information necessary to complete the application, and to accept the "knowledge" obtained in doing so. That is his "job," so anything he learns in relation thereto is imputed to the company. On the other hand, in the first group of cases, the soliciting agent had not been given authority by the company to accept the kinds of notices or to receive the types of "knowledge" which was involved. In other words, it was not the soliciting agent's job to determine the type of information involved in the first group of cases, but it was his job to obtain information necessary to complete the application and obtain information necessary to allow others in his company to evaluate the risk. Since that was his "job," the knowledge gained is imputed to the company, irrespective of whether he is characterized as a general or soliciting agent.

In summary, the Court has little difficulty finding that, even though Hartley was a soliciting agent, his knowledge acquired in relation to the questions asked on the application for insurance and during the preparation of the application is imputed to the company. Thus, the question that the Court must now face is whether the "facts" obtained by the agent about the state of health of Jerry Jackson at the time the application was completed was sufficient to

support the jury's conclusion that there was not "a misrepresentation, omission, concealment or incorrect statement made by Jerry A. Jackson in the application for the policy in question."

It is now clear that the test that the Court must use in ruling on a motion for judgment notwithstanding the verdict and on a motion for directed verdict is the same. As indicated in 9 Wright & Miller, *Federal Practice and Procedure: Civil* § 2524: "In determining whether the evidence is sufficient, the Court is not free to weigh the evidence or to pass on the credibility of witnesses or to substitute its judgment of the facts for that of the jury." (citing cases.) As stated by the Court of Appeals for the Second Circuit in *Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir.1970):

Simply stated, it is whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached.

■ As the cases cited in the Wright & Miller work at p. 542 indicate, motions for judgment notwithstanding the verdict are to be sparingly granted since such a motion deprives the party of a determination of the facts by a jury.

There is no question in this case but that the jury determined that, in spite of the manner in which question 19b. of the application for insurance was answered, this was not the result of misrepresentations, omissions, concealment of facts, or incorrect statements made by Jerry Jackson. Frankly, the Court would not have reached the same conclusion on the evidence heard and probably would have concluded that, at least, there were omissions, concealment of facts, or incorrect statements, but, as indicated, the Court is not free to make that determination. The Court of Appeals for the Eighth Circuit is one of the courts that has held unequivocally that a trial court is not free to substitute its judgment of the facts for that of a jury. *Northrup v. Arch-*

*bishop Bergan Mercy Hospital,* 575 F.2d 605 (8th Cir.1978), and *Nielson v. Armstrong Rubber Co.,* 570 F.2d 272 (8th Cir.1978).

 Since that is the case, the Court must conclude that, even though it might have concluded otherwise had it been the trier of fact, there was sufficient evidence to support the jury's verdict in this case. It is undisputed that Agent Hartley had known Jerry Jackson for a number of years and that he was aware that Jackson's family had a history of heart conditions. There is no question but that, during the course of obtaining the information necessary to complete the application, he was advised of Jackson's visit to a cardiologist in Tulsa, Oklahoma, some 100 miles away from Jackson's home, and that an electrocardiogram and stress test had been given and that the results were abnormal. He was advised that Jackson was to return to Tulsa within two or three days to undergo further tests. The jury certainly had a right to conclude that Hartley, defendant's agent of fourteen years, could not stick his head in the sand and disregard all of that evidence in answering question 19b. The jury could have concluded that Jackson gave him all of the information necessary to put him on notice that his problem was not a routine one and was not the result of a routine physical, but that more serious problems must exist. When the knowledge that Hartley had is coupled with his unequivocal testimony that he did not believe that Jerry Jackson lied to him at the time or that he would lie to anyone, there is, in the Court's view, an abundance of evidence from which the jury could have reached the conclusion that it did.

For these reasons, the motion for directed verdict and motion for judgment notwithstanding the verdict will be denied, and judgment will be entered in favor of the plaintiff for the sum of $42,000.00, plus twelve per cent (12%) penalty and reasonable attorney's fees as directed by the provisions of Ark.Stat.Ann. § 66–3238.

The Court also has before it an affidavit of John R. Elrod, attorney for the plaintiff, and his brief in support of his request that attorney's fees be allowed. He requests that the Court award an attorney's fee of $10,000.00 and that he be reimbursed for expenses in the amount of $497.10.

 In his affidavit, the attorney swears, among other things, that he expended approximately 70 hours in the prosecution of the case and that his normal rate for such services is $75.00 per hour which he considers "to be at or below the average hourly rate for matters of litigation in the area of Northwest Arkansas." He says that his arrangement with his client for handling the matter calls for a contingency fee of one-third of all amounts collected subsequent to the filing of suit, or 40% of all amounts collected if the judgment·is appealed.

The Court finds that the 70 hours which attorney Elrod claims he spent in prosecuting this case is reasonable and that the hourly rate of $75.00 per hour requested by him is also reasonable. For this reason, the Court will award him an attorney's fee of $5,250.00.

In addition, attorney Elrod seeks reimbursement for the following expenses:

| | |
|---|---|
| Filing fee (Benton County Circuit Court) | $ 40.00 |
| Expert witness fee (Dr. Weaver) | 300.00 |
| Hartley deposition | 111.50 |
| Lynch deposition | 45.60 |
| Total Reimbursable Expenses | $ 497.10 |

 The Court believes that all of the amounts requested, with the exception of the cost of the deposition of Hartley are recoverable, and costs of $385.60 will be awarded. The Hartley deposition was not read at the trial and is not, in the Court's view, a recoverable cost. Judgment will be entered as indicated in this opinion.