CALLICOTT *v.* DIXIE LIFE & ACCIDENT INSURANCE COMPANY.

4-5429 · 127 S. W. 2d 620

Opinion delivered April 24, 1939.

*Bradley & Patten,* for appellant.

*Brickhouse & Brickhouse,* for appellee.

MEHAFFY, J. On September 24, 1937, the appellee issued a policy on the life of William F. Harrelson, and his sister, Mrs. Jimmie Callicott was named beneficiary. The policy provided that in the event of the death of insured, while the same was in full force and effect, appellee would pay to the beneficiary the sum of $270 in cash. The insured died on December 27, 1937; proof of death was made, and the appellant denied liability.

This action was begun to collect on said policy, and the appellant prayed judgment in the sum of $270 with interest at the rate of 6% from January 1, 1938, the statutory penalty of 12%, and attorneys' fees. The answer denied every material allegation, but admitted issuing the policy; alleged that the application was signed by Mrs. Jimmie Callicott, sister of the insured. It was also alleged in the answer that the policy provided that: "the company assumes no obligation herein until the inspection fee and the first premiums are paid in full, and this policy is delivered and accepted by the original owner while all the lives insured hereunder are alive and

in good health." That at the time said policy was delivered the insured was living in Hot Springs and suffering from acute cardiac dilitation and chronic myocarditis, and suffered from heart trouble since childhood. There was tendered the premiums that had been paid, and it was asked that the complaint be dismissed.

The appellant testified as follows: "That her name was Mrs. Jimmie Callicott; that she was the plaintiff in the suit and had a brother, William F. Harrelson, who was insured by the defendant, identifying the policy of W. F. 2837. The policy was introduced and will be abstracted hereinafter; that she had paid the premiums on the policy herself and same were paid through the time that her brother died and identifying the premium receipt book which was introduced and will be abstracted hereinafter; that the inspection fee and the first monthly premium were paid at the time the policy was delivered; that she was working in the Arcade Building in Little Rock and had never seen Mrs. Keener, the representative of the company, prior to the time she was solicited for insurance by Mrs. Keener; that at that time she was not interested in a policy because she had a brother to support and that then Mrs. Keener wanted to write a policy on her brother; that her brother lived with her in Little Rock at 319 S. Martin Street; that the agreement was not reached then, that later the representative of the company returned to see her and that at that time she discussed the condition of her brother fully with the representative of the company and informed her 'he had heart trouble and while he was up and around all the time, heart trouble was a fatal and unfortunate disease and so hadn't considered it. She thought I could insure him. I told her that the doctors—our doctors—had said that perhaps he would live to be older than I, that it was an uncertain thing'; that this information was conveyed to the representative of the company while said representative was trying to write the policy; at that time no agreement was reached; that the representative of the company returned several times, insisting that she take out the policy on her brother and that an application was

finally executed for the policy. Witness did not fill out the application, that no question was asked by Mrs. Keener at the time the application was filled out, but on the contrary the representative filled in the application and merely asked her to sign it, which she did; that it was not read over to her and that she did not read it nor know its contents and that when the policy was delivered some time later, the inspection fee and premiums were paid thereon; that upon the death of her brother in December, 1937, she called at the office and executed proofs of his death and that they refused to pay.''

CROSS-EXAMINATION

''That her brother had been sick practically all of his life and had heart trouble when he was a little fellow; that prior to this time she had not taken out any insurance on his life, nor anyone else; that her sister also had a burial policy on her brother. And in answer to a question whether he was strong or emaciated, weak and that sort of thing, replied: 'He was in a little improved condition as to what he had been, but he always had been up and around and had taken exercise. He had gotten out a little, never stayed in bed. He was always up but had a little crookedness in his spine. I don't know just what it was. He was having it attended to; Dr. Murphy said that would improve his heart condition'; that Dr. Murphy had treated him for two years and was treating him at that time; that her brother did guide service on Lake Hamilton and Hot Springs and that was about all the work he did, that he frequently visited Hot Springs; that he would come to her office in the Arcade Building where she worked and while there would rest and relax, but did not lie down; that she went to the company's office and had it changed from a designated mortician to an undesignated one because she found out her sister had a burial policy and that she understood the company would not permit two burial policies, so she had it changed, that she didn't know how long he would live but he had lived twenty years; that she had the policy down at the shop with her for a long time, but

finally took it home and put it in a shoe box. And in reply to the following questions said:

"Q. Now, Mrs. Callicott, to be frank about it, your brother was really a sick man at the time this policy was taken out, wasn't he?"

"A. Yes, sir, he was—he seemed to be doing better. He was stronger and better and we had very great hopes of his improvement."

"Dr. Murphy gave her these hopes. That she had not discussed the taking out of the policy with him, but later when the company wrote to him about the policy change that she then discussed it with him and told him that if he got sick she thought the policy would pay the hospital bill for three weeks and it would help her with the expenses; that she and Mrs. Terrell did not read the policy together. The witness denied that she had told Mrs. Terrell that she would not tell her brother because of the shock. Said that she did not remember about discussing the policy with Mrs. Terrell relative to the two-year uncontestible clause; that she had a sister living in Hot Springs part of the time, but that her brother did not stay with her sister over there, but when he was doing guide service would stay with some friends and that he died at the home of Mrs. A. G. Dean. She stated that the question relative to kidneys, liver, skin, blood, genital organs, heart, bladder, rheumatism, cancer, dropsy, rupture, paralysis, bronchitis, syphilis, female trouble, asthma, ulcers or any other diseases or ailments not mentioned herein was not read to her nor did she know it was in the application. The witness stated that in her discussions with the representative of the company, she had told the representative that her brother had heart trouble, but that he was in better condition and was really better; that she was familiar with the coroner, but that she did not know of what her brother died, and that when she told Mrs. Keener, representative of the insurance company, about his condition that she assumed the agent would put down the correct answers."

The above is the testimony in full of appellant, as set out in her abstract.

Mrs. A. M. Patrick testified that she was present when the policy was delivered by Mrs. Keener to Mrs. Callicott; that she heard Mrs. Callicott say to Mrs. Keener that she was surprised it was going through in her brother's condition.

Mrs. Bertha Terrell testified that she operated a shop in the Arcade Building where Mrs. Callicott and Mrs. Patrick worked; that she was present when Mrs. Keener of the Dixie Life & Accident Insurance Company solicited insurance from her and Mrs. Callicott; that she heard Mrs. Keener ask Mrs. Callicott a question relative to the health of her brother, and Mrs. Callicott said that he was as well as he ever was; that she and Mrs. Callicott read the policy over together; there was a two-year uncontestible clause and Mrs. Callicott stated that she was going to keep from her brother the fact of taking insurance on him because it would be a shock to him.

The policy was introduced in evidence and also the receipt book showing that the premiums had been paid through January 1, 1938. At the close of the testimony the court directed a verdict and the jury returned the following verdict: "We, the jury, acting under instructions of the Court, find for the defendant." Judgment was entered and motion for new trial was filed and overruled, and the case is here on appeal.

The appellant urges first, that she had informed the soliciting agent of the true condition of her brother, and that such knowledge acquired by the representative in the performance of her duty, was knowledge of the company.

Knowledge of the agent of the insurer, obtained while performing the duties of his agency in receiving applications and delivering policies, is imputed to the insurer. The undisputed evidence in this case shows that the appellant told the representative of the insurance company the condition of her brother's health. It is not contended that she made any false statements, and, therefore, the representative of the company knew all the facts with reference to insured's health, and this was knowledge of the company. *Supreme Forest Woodmen*

*Circle* v. *Sneed,* 190 Ark. 112, 77 S. W. 2d 636; *Mid-Continent Life Ins. Co.* v. *Parker,* 181 Ark. 213, 25 S. W. 2d 10.

This court has many times held that where an applicant states all the facts to the representative of the company taking the application, the knowledge thus obtained by the representative is knowledge of the company. *United Fidelity Life Ins. Co.* v. *Taylor,* 188 Ark. 1168, 68 S. W. 2d 1011.

It is contended, however, by the appellee, that the policy was void because the consent of the insured was not obtained; that the policy was taken without his knowledge or consent. The evidence conclusively shows this to be true, and this would make the policy voidable. One who takes out a policy of insurance on the life of his brother without the knowledge or consent of the latter, cannot maintain an action against the company on the policy. 14 R. C. L. 889.

It is against public policy to allow one person to have insurance on the life of another without the knowledge of the latter. It is not only the general rule that the consent of the insured must be had, but that is the rule in this jurisdiction, and this case is ruled by the case of *Amer. Benefit Life Ins. Ass'n* v. *Armstrong,* 183 Ark. 47, 34 S. W. 2d 1082. In that case the court said: "It must be remembered that the plaintiff beneficiary made the application for this policy, and paid the premium thereon, and that it was issued upon her application. If she had not authority to make this application, the policy would be void on that account."

In the instant case the application was made by the appellant in Little Rock without the knowledge or consent of her brother who was in Hot Springs. She claims, however, that after the policy had been issued she told her brother about it; but her own statement shows that she did not tell him she had insurance on his life, but that she had a policy that would enable him to go to the hospital if he were sick, and help her pay the expenses. There was no consent or knowledge on the part of the insured as to there being a policy on his life.

The judgment of the circuit court is affirmed.