**CONNECTICUT GENERAL LIFE INSURANCE COMPANY, Plaintiff,**

v.

**Ross J. WOOD, Defendant.**

**Civ. A. No. C82–1896A.**

United States District Court, N.D. Georgia, Atlanta Division.

Jan. 27, 1984.

See also, D.C., 631 F.Supp. 15.

**10**

Thomas E. Magill, H. Sanders Carter, Jr., Carter, Ansley, Smith & McLendon, Douglas N. Campbell, Mitchell, Loggins, Campbell & Elsberry, Atlanta, Ga., for plaintiff.

Richard P. Decker, Robert A. Moss, Decker, Cooper & Hallman, Atlanta, Ga., for defendant.

### ORDER

MOYE, Chief Judge.

Before the Court in the above-styled civil action are cross-motions for complete or partial summary judgment and a motion to strike the affidavit of Francis E. McBride.

*Part I—Background*
*Section A*

This is a diversity action involving insurance coverage of $120,000.00 on the life of Kristofer Lee Wood ["Kristofer"], who died at the age of twenty-two of respiratory failure resulting from muscular dystrophy.

On September 1, 1977, Connecticut General Life Insurance Company ["Connecticut General"] became the group insurer for the American Society of Quality Control and issued Group Term Life Policy No. 0423818–01 to the Trustee of the Engineering, Scientific and Technical Organizations Life Insurance Trust, as policyholder. By virtue of the issuance of the group policy, the American Society of Quality Control granted Connecticut General the right, or franchise, to offer to individual members of the Society the opportunity to apply for life insurance coverage. Applicants were required to submit evidence of insurability satisfactory to Connecticut General, and all such applications were considered by Connecticut General and accepted or rejected on an individual basis in accordance with the company's applicable underwriting standards. Affidavit of Francis E. McBride, Connecticut General's Medical Underwriter.[1]

In years 1978, 1979, 1980, and 1981, Connecticut General received various applications for insurance on Kristofer's life, each application being for coverage under the

---

1. The affidavit of Ms. McBride satisfies the requirements of Fed.R.Civ.P. 56. The motion to strike the McBride affidavit is DENIED for the same reasons the Court denied a similar motion in *Guarantee Trust Life Insurance Company v. Wood,* Civil Action No. C82–1897A, 631 F.Supp. 15. *See Guarantee Trust* order, footnote 1.

group policy and representing that Kristofer was a member of the American Society of Quality Control. Wood was designated as beneficiary in each instance.

The first application contained various representations as to Kristofer's health, was purportedly signed "Kris L. Wood" and was dated October 8, 1978. Pursuant to and in reliance upon that application, Connecticut issued certificate no. 7617–001579 on November 1, 1978, evidencing "Option C" coverage which, according to the schedule on page 4 of the certificate, was in the amount of $30,000.00. McBride Affidavit.

Over the next three years, Connecticut General received additional applications or requests for increased coverage purportedly signed by Kristofer. Each application or request either contained new representations as to Kristofer's health or reaffirmed earlier representations. Each application and request was individually considered and approved under Connecticut General's underwriting standards, and in each instance a new certificate of insurance was issued. Each certificate provided a new "face value" or amount of coverage ("Option C," "Option F," etc.). The Connecticut General certificates were issued in the following sequence:

| | Date of Application | Date of Issue | Face Value |
|---|---|---|---|
| 1st Certificate | 10–8–78 | 11–1–78 | $30,000.00 |
| 2nd Certificate | 2–6–79 | 3–1–79 | $60,000.00 |
| 3rd Certificate | None (automatic increase) | 11–15–79 | $72,000.00 |
| 4th Certificate | 2–9–80 | 2–28–80 | $84,000.00 |
| 5th Certificate | 3–4–80 | 3–18–80 | $96,000.00 |
| 6th Certificate | 2–8–81 | 2–23–81 | $108,000.00 |

After issuing the sixth certificate, Connecticut General received a further request to increase coverage which was signed "Kris L. Wood" and dated March 2, 1981. The request reaffirmed all statements which were contained in the earlier application of February 8, 1981, to $120,000.00. (A new certificate was not issued). McBride Affidavit.

Each application submitted to Connecticut General contained questions and answers concerning Kristofer's health and medical history, as well as other matters

which Connecticut General takes into consideration in evaluating an application for life insurance. Those questions and answers included the following:

## 5. STATEMENT OF HEALTH

c. Is any person proposed for insurance ill or contemplating any medical or surgical treatment?
Answer: *No.*
d. Has any person proposed for insurance *ever had:* heart trouble, elevated blood pressure, ulcers, cancer, diabetes, nervous disorders, tuberculosis, asthma or emphysema, albumin, blood or sugar in urine, *other illness, disease, injury?*
Answer: *No.*
3. During the *past five years* has any person proposed for insurance *had any illness, disease or injury,* consulted any physician or been confined or treated in any hospital, rest home, sanitarium or similar institution?
Answer: *No* (except that on one application it was stated that Kristofer had been treated in 1976 for a broken arm).
Each application further stated:

*I* hereby enroll for the Group Term Life Insurance requested above and *declare* that to the *best of my knowledge and belief:* (a) that I am eligible for such insurance under the terms of the Group Policy or Policies issued by Connecticut General Life Insurance Company, and (b) *that the statements I have made* above with *respect to myself* ... are *true and complete* and shall be relied upon by the insurance company and be taken as a basis for the issuance of insurance ... (emphasis added)

Connecticut General assumed that the information set out in each application for insurance was true and correct, as represented, and based on that reliance, Connecticut General issued each of the certificates, the last of which, as modified, provided life insurance coverage in the amount of $120,000.00. McBride Affidavit.

In addition each certificate contained the following incontestability clause:

This Certificate will be incontestable after it has been in force during the lifetime of the insured for two years from the Date of Issue, except for nonpayment of premiums.

Kristofer died within two years of the date on which the final $120,000.00 certificate was issued, but more than two years after the issuance of the first three certificates. After Kristofer's death, Wood submitted claims to Connecticut General and to numerous carriers. Connecticut General investigated and upon learning of Kristofer's undisclosed muscular dystrophy denied the claim. This litigation followed.

Five similar actions are pending before this Court as set out in Part I of this Court's order in *Guarantee Trust Life Insurance Company v. Wood*, Civil Action No. C83–1897A.

### Section B
### Kristofer's History of Muscular Dystrophy

In Part I, Section B of the *Guarantee Trust* order, this Court sets forth a history of the development of muscular dystrophy during Kristofer's life. The Court incorporates by reference that history into this opinion.

### Part II

The Court first confronts Connecticut General's contention that Kristofer's coverage is void *ab initio* because he neither signed the application nor consented in writing to the issuance of coverage under O.C.G.A. § 33–24–6(a) (Ga.Code Ann. § 56–2407). Section 33–24–6(a) reads in pertinent part as follows:

> No life ... insurance contract upon an individual, except a contract of group life insurance ..., shall be made or effectuated unless at the time of the making of the contract the individual insured, ..., applies for a life ... insurance contract or consents in writing to the contract....

The thrust of Wood's opposition to the argument is that the statute is not applicable to the case at bar because the statute explicitly excludes its application to group policies and because Connecticut General is barred from raising this argument in light of the incontestability clause contained in the initial certificate.

██ As a preliminary matter, the Court in *Guarantee Trust*, concerning insurance contracts upon an individual, held on public policy grounds that an incontestability clause is no bar to the argument that the policy is void *ab initio* on the basis that the insured neither applied for nor consented in writing to the issuance of the coverage as required by O.C.G.A. § 33–24–6(a). *See* Part III of the *Guarantee Trust* order.

As a result, the Court must now consider whether the statute applies to applications under the policy issued by Connecticut General.

A careful review of the public policy considerations which underlie the statute and of the nature of the Connecticut General coverage leads to the conclusion that the statute is applicable. The cardinal rule of statutory construction is to ascertain the legislative intent and purpose in enacting a law and then give it the construction that will effectuate the legislative intent and purpose. *Hollowell v. Jove*, 247 Ga. 678, 279 S.E.2d 430 (1981). In determining the intention of the legislature in enacting a particular statute, the Court should look to the old law and to the evil which the legislature sought to correct. *Barton v. Atkinson*, 228 Ga. 733, 187 S.E.2d 835 (1972).

In the early common law, there was no requirement that the owner of a life insurance policy have an insurable interest in the life of the insured, nor was there any requirement that the insured consent to the coverage on his life. The statutory requirement of insurable interest was intended to prevent wagering on human lives. The insurable interest requirement is inbred with a potential conflict of interest when one with an insurable interest obtains coverage on the insured without the insured's consent. The conflict is that the beneficiary of the policy has both an interest in the insured's continued life (the insurable interest) and an interest in the insured's death (as beneficiary of the policy).

*See* W.F. Meyer, Life & Health Insurance Law § 4.6 (1972). As expressed by the court in *Metropolitan Life Insurance Co. v. Smith,* 122 Ky.Law.Rep. 868, 59 S.W. 224 (1900), this conflict might be a fruitful source of crime. At the very least, it creates a substantial risk to the unknowing insured person.

As in other cases of conflict of interest, the consent of the party who would be affected by the conflict interest obviates the public concern since the affected party can best evaluate the risk to his own interest. In the context of life insurance, it was recognized early in our jurisprudence that it is against public policy to procure insurance on the life of another without his consent, even though the insurance was procured by one having an insurable interest. *See e.g., Byrne v. Prudential Insurance Company of America,* 88 S.W.2d 344 (Mo.1935). *See also* 44 C.J.S. Insurance § 241.

Section 33–24–6(a) of the Official Code of Georgia Annotated (Ga.Code Ann. § 56–2407) is an expression of the public policy of Georgia and is an extension of the common law rule that a valid policy of insurance may not be issued on the life of an adult without the knowledge and consent of the person insured. 44 C.J.S. Insurance § 241. The reason is to avoid extending to the beneficiary the temptation to hasten by improper means the time when he will receive the benefits of the policy. Insurance contracts which violate this common law rule are against public policy and are void, and no court will concern itself with the enforcement of such a contract. *See Gordon v. Gulf American Fire & Casualty Co.,* 113 Ga.App. 755, 149 S.E.2d 725 (1966).

"While the policy at common law dealt with 'knowledge or consent', the Georgia Legislature has been even more restrictive by providing that the insured must either apply for the insurance or consent thereto *in writing.*" *Wren v. New York Life Insurance Co.,* 59 F.R.D. 484 (N.D.Ga.1973), *aff'd* 493 F.2d 839 (5th Cir.1974) (emphasis by the court). The reason for the rule was

explained by the Court of Appeals at 493 F.2d 841:

It logically follows that the purpose of the statute is to put the consent beyond all question by requiring it to be in writing. Likewise, the very purpose and specific requirement of the statute would be rendered meaningless if one could meet its terms by alleging consent to have been verbally authorized, something that the deceased insured would hardly be in a position to dispute.

These public policy considerations, as well as the rationale of *Wren,* apply with equal force to Kristofer's coverage under the type of group policy issued by Connecticut General and to his coverage under various individual policies (e.g., policies in the *Guarantee Trust* case). In each instance, Wood filled out the application, naming himself as beneficiary and signing his son's name allegedly with Kristofer's permission. Nevertheless, the statute appears to except a "contract of group life insurance." Understanding the rationale for this exception reveals that it is inapplicable to the present case.

The type of group policies authorized in Georgia are defined in O.C.G.A. § 33–27–1 (Ga.Code Ann. § 56–2701). Subsection (1) permits a group policy to be issued to an employer insuring his employees "for the benefit of persons other than the employer." Subsections (4) (Labor Unions), (5) (Trustee Groups) and (6) (Association Groups) contain nearly identical language precluding the group policyholder from procuring insurance on its members for the benefit of the group policyholder. *In each instance, the group insurance must be for the benefit of someone other than the group itself. Since such a group, by statute, cannot be the beneficiary of the insurance on its members, there is no potential for wrongdoing nor any conflict of interest in permitting the group to procure life insurance on its members without their consent. Cf. Whitestone General Hospital v. IntraAmerica Life Insurance Co.,* 60 Misc.2d 656, 303 N.Y. S.2d 589 (1969), *aff'd* without opinion 35

A.D.2d 782, 315 N.Y.S.2d 816 (holding that, since a partnership was named beneficiary of insurance on the life of a partner, the policy was not a group life policy and, therefore, was not exempt from the statute requiring the insured's application or written consent).

The circumstances of the instant case do not fall within the intended scope of the exception. In this case, each application for insurance on Kristofer's life was submitted to the insurer for an individual determination whether to accept the risk. More importantly, it was not the group policyholder who sought to procure insurance coverage on Kristofer without his consent; rather, Wood completed the applications and initiated the insurance. Wood, unlike the group policyholder, was not prevented from naming himself beneficiary on the policies, and he did so allegedly by direction of Kristofer. In these circumstances, the necessity for the written consent of the insured is patent and falls within the general requirement of § 33–24–6(a) rather than the exception for a "contract of group insurance."

This construction of § 33–24–6(a) effectuates the intention of the legislature in enacting that section. The intention of the legislature must be carried out, even though the literal sense of the terms used in the statute may appear to be different from the clear intent. *State v. Livingston,* 222 Ga. 441, 150 S.E.2d 648 (1966). Here, that legislative intent becomes evident when the nature of "group insurance" is examined. In *McFarland v. Business Men's Assurance Co. of America,* 105 Ga. App. 209, 124 S.E.2d 432 (1962), the court defined group insurance: "Group insurance is the coverage of a number of individuals by means of a single or blanket insurance policy. In group insurance employees do not make individual applications, and they receive certificates referring to the master policy which is issued to the employer." By limiting the exception for group insurance in § 33–24–6(a) to the type of "true group" insurance defined in *McFarland,* the evil that the statute was designed to

remedy is eliminated and the legislative purpose is effectuated.

Additionally, the coverage extended to Kristofer is not "true group" insurance, but is "franchise" insurance, McBride affidavit, a type of coverage having some similarities both to group insurance and to individual policies. As described in 1 Appleman, Insurance Law and Practice § 54 at 178:

The term 'franchise' comes from the fact that by accepting a master policy the governing entity of the association or other organization grants a franchise to the insurer to solicit its members, or other personnel, and places a qualified stamp of approval upon its plan. Ordinarily, it will permit its official letterhead to be used upon communications to the members and often an article, or advertising, will appear in its official publication to the effect that such is an 'approved' or 'sponsored' plan. The holder of the master policy and the insurer may negotiate for modification in the terms of the coverage and even agree to its termination, but not without keeping the certificate holders apprised of any changes which are made. With that qualification, *the situation is precisely that of an insurer dealing directly with its policyholders,* and each insured has independent rights against the insurer which are exactly the same as if there were no other contracts existing between such company and the organization or other members. (Emphasis added.)

Contracts of insurance written on the franchise plan "bear the same legal consequences as any individually written policy." *Id.* at 181. As a consequence, the necessity for the signature of the individual insured, as required by O.C.G.A. § 33–24–6(a), is exactly the same under a franchise plan as under an individual policy. Here, it is undisputed that Kristofer did not apply for the life insurance nor did he consent in writing for Wood to procure insurance on his life. In these circumstances, the contracts are void *ab initio. Wren, supra. See also Alleman v. Lincoln National*

*Life Insurance Co.,* 636 F.2d 1195 (10th Cir.1981).

Consistent with the holding in the *Guarantee Trust* case, the Court concludes on public policy grounds that in this case the incontestability clause contained in the certificate is no bar to Connecticut General's action based upon section 33–24–6(a). In addition, the Court concludes that section 33–24–6(a) applies to the specific type of insurance (that are not "pure group" insurance) issued by Connecticut General in this case. Finally, the Court decides that the coverage is void *ab initio* because Kristofer, the insured, neither signed the application nor consented in writing to the issuance of the coverage.

### Part III—O.C.G.A. § 33–4–6

 An insurance company is liable for attorneys' fees and a penalty where the refusal is in bad faith, frivolous, and unfounded. *Mead Corp. v. Liberty Mutual Insurance Co.,* 107 Ga.App. 167, 129 S.E.2d 162 (1962), *rev'd on other grounds,* 219 Ga. 6, 131 S.E.2d 534 (1963). Because the Court determines that the coverage is void *ab initio* and that there is no evidence of bad faith on behalf of Connecticut General, Wood is not entitled to recover under section 33–4–6.

### Part IV—Conclusion

In summary, the Court makes the following determinations:

1) that Connecticut General is entitled as a matter of law, to a declaratory judgment that the coverage is void *ab initio* because (1) the type of coverage in this case falls squarely within the intended application of O.C.G.A. § 33–24–6(a), (2) the incontestability clause contained in the certificate does not bar the instant action based upon 33–24–6(a), and (3) the application was neither signed by Kristofer, the insured, nor consented to in writing by him;

2) that the McBride affidavit satisfies the requirements of Fed.R.Civ.P. 56; and

3) that Wood is not entitled to a 25% penalty and attorneys' fees in this case in which there is merit to the plaintiff's position and there is no evidence of bad faith on the part of the plaintiff.

Consistent with the determinations in the body of this order, the Court GRANTS Connecticut General's motion and DENIES Wood's motion for summary judgment. The Court also DENIES Wood's motion to strike the affidavit of Francis E. McBride.