614 A.2d 96

**Sharon HOPKINS**

v.

**Bruce HOPKINS.**

**No. 87, Sept. Term, 1991.**

Court of Appeals of Maryland.

Oct. 26, 1992.

Linda H. Lamone, Annapolis, for appellant.

Bryan Renehan (Ellen L. Lee, Brodsky, Greenblatt & Renehan, all on brief), Gaithersburg, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

ROBERT M. BELL, Judge.

We granted certiorari to decide whether the circuit court, in order to protect the income stream which alimony represents, may compel the obligor ex-spouse to cooperate with the obligee ex-spouse so that she may obtain, at her expense, an insurance policy on his life, of which she would be the beneficiary. Our research uncovered an issue, not raised by either party, which is dispositive. Thus, we need address only whether an ex-spouse recipient of alimony has an insurable interest in the life of the obligor ex-spouse and if, as a precondition to a valid contract of life insurance, a statute requires an insured to consent, a court may order a non-consenting obligor ex-spouse to cooperate so that the obligee-ex-spouse may acquire insurance on his life.

## I.

The facts necessary to resolve this case are rather simple and straightforward. Sharon Hopkins, the appellant, was granted an absolute divorce from Bruce Hopkins, the appellee, after twenty-two years of marriage and the emancipation of their issue. The Circuit Court for Montgomery County awarded the appellant one-half of the value of the

marital home,[1] permanent alimony of $4,000 per month, and $25,000 toward her attorney's fees. No monetary award was made.

In its Memorandum Opinion and Order, the court explained the basis for the awards. The appellee, an attorney in a large law firm, earned, on a fixed salary basis, $140,000 per year. On the other hand, the appellant had only completed two years of college and, although she had been employed during the marriage and had even obtained a certificate permitting her to sell securities, she had never earned a significant salary. She had been, the court observed, the primary caretaker for the couple's two children and she had assisted her husband with his career.

Although suffering from the usual stresses and tensions resulting from a marital break-up, he was, the court noted, in good physical health. The appellant's health, the trial court found, was not good. Her "physical and mental conditions have deteriorated as a result of the marital breakup to the degree that she has lost twenty-eight pounds since the separation, has difficulty sleeping and suffers from a condition diagnosed as syncope, a condition associated with fainting spells which occur frequently and without advance warning." Noting the present state of the appellant's health, the court concluded that, "[a]t best, she will become marginally self-sustaining without supplementation of her income" and "that even after [the appellant] has achieved her maximum earning potential the disparity in income between Husband and Wife will be unconscionably disparate." The trial court found that the appellee's income approximated $16,000.00 per month and is likely to increase, while the appellant lacked special skills which would allow her to earn a substantial salary. At the time of the divorce,

---

1. The court determined that the marital home had a market value of $454,400, of which the appellant was entitled to $227,200. The appellant now maintains that she netted only $69,530 from the sale of that home and that most of that amount has now been depleted.

the appellee was forty-eight years old and the appellant forty-five.

Approximately six weeks after the appellant was granted a final divorce, she contacted her ex-husband to request his cooperation in obtaining a $1,000,000 insurance policy on his life. Her reason for doing so, she related, was the serious concerns she had about the appellee's health and, thus, her perceived need to safeguard her alimony. She informed the appellee that she would pay the premiums and all other costs of the policy, and that all that was required of him was a physical examination. The appellee refused the appellant's request, citing the rancorous history between the parties. He also indicated that he did not want to be "worth more dead than alive...." The appellant filed a Motion To Compel Defendant To Cooperate With Plaintiff's Request For Life Insurance. The appellee urged the court to deny the motion, noting the lack of any cited authority. After a hearing, despite its expressed belief that the request was not unreasonable, the court denied the motion, with prejudice. While the court did not state its reasons, from the tenor of the arguments and colloquies during the hearing, it seems apparent that the court did not believe that it had the power to grant the motion.[2] The appellant appealed to the Court of Special Appeals. We issued a writ of certiorari while the appeal was pending in the intermediate appellate court.

## II.

At the threshold, we address whether the obligation of one ex-spouse to pay alimony to the other for an indefinite period[3] is an interest that may be insured by the

---

**2.** At oral argument, counsel for the appellee did not disagree with this characterization.

**3.** Alimony is "'a periodical allowance during the joint lives of the spouses for the wife's [or husband's] support and maintenance....'" *Grove v. Frame,* 285 Md. 691, 695, 402 A.2d 892, 895 (1979), quoting *Winkel v. Winkel,* 178 Md. 489, 498, 15 A.2d 914, 918 (1940). "Unless

recipient. Consistent with the appellant's argument, with which the appellee does not express serious disagreement, we hold that it is.

Maryland law has long prohibited anyone, other than one with an insurable interest, from insuring another person's life. *Rittler v. Smith,* 70 Md. 261, 263, 16 A. 890, 891 (1889). *See also Beard v. Am. Agency,* 314 Md. 235, 243–44, 550 A.2d 677, 681 (1988). The primary purpose of the prohibition is to prevent wagering on the life of another, *id.,* although, as other authorities recognize, *see e.g.* Edwin W. Patterson, *Essentials of Insurance Law* § 34, at 158 (1957), the prevention of murder is another rationale. At common law, an insurable interest connoted a relationship between the insured and the beneficiary such that, for the beneficiary, "there is a actual expectancy which will be curtailed by the insured's death." Robert E. Keeton & Alan I. Widiss, *Insurance Law* § 3.5(a), at 179 (1988). Such relationship may be pecuniary or based on blood or affinity. *Id.*

Maryland Code (1957, 1991 Repl.Vol. & 1992 Cum.Supp.) Art. 48A, § 366 is a codification of the common law rule. It provides, in pertinent part:

(a) *When required.*—Any individual of competent legal capacity may procure or effect an insurance contract upon his own life or body for the benefit of any person. But no person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under such contract are payable to the individual insured or his personal representatives, or to a person having, at the time when such contract was made, an insurable interest in the individual insured.

\* \* \* \* \* \*

the parties agree otherwise," indefinite alimony terminates on the death of either party. Maryland Code (1984, 1991 Repl.Vol.) § 11–108 of the Family Law Article.

(c) *Definition.*—(1) "Insurable interest" with reference to personal insurance includes only interests as follows:

(i) In the case of individuals related closely by blood or by law, a substantial interest engendered by love and affection.

(ii)1. In the case of other persons, a lawful and substantial economic interest in having the life, health, or bodily safety of the individual insured continue, as distinguished from an interest which would arise only by, or would be enhanced in value by, the death, disablement or injury of the individual insurer.

\* \* \* \* \* \*

The husband/wife relationship is covered by subsection (c)(1)(i). The direct and intimate ties existing between husband and wife are such that each reasonably has an expectancy of a familial benefit, if not an economic one, from the continued life of the other. Patterson, *Essentials of Insurance Law* § 38 at 172–74.

■ An absolute divorce ordinarily terminates the insurable interest of each spouse in the life of the other. *See Couch on Insurance* § 24:126, at 219 (2d rev. ed. 1984). When, however, a divorce decree orders one spouse to pay alimony to the other, the insurable interest continues for the obligee ex-spouse. And it exists as long as the alimony is payable. *Id.* at 220; Art. 48A § 366(c)(1)(ii)(1). As the Court of Appeals of South Carolina put it, "[i]t is a well settled proposition of law that a former wife who is entitled to alimony has an insurable interest in her former husband's life." *Shealy v. Shealy*, 280 S.C. 494, 313 S.E.2d 48, 50 (1984). *See also Mullenax v. Nat'l Reserve Life Ins. Co.*, 29 Colo.App. 418, 485 P.2d 137 (1971); *Pitts v. Ashcraft*, 586 S.W.2d 685, 695 (Tex.Civ.App.1979).

The appellant, as the recipient of court ordered alimony, for an indefinite period, from the appellee, will suffer a significant and substantial economic loss in the event of his death. Accordingly, she has "a lawful and substantial

economic interest in having the life [of the appellee] continue," *i.e.* an insurable interest.

### III.

 The conclusion that the appellant has an insurable interest in the appellee's life, rather than ending our inquiry, requires us to consider the nature of the "consent" required by Maryland Code (1957, 1991 Repl.Vol.) Art. 48A, § 371, as a predicate to the validity of a life insurance contract. Section 371(a) provides:

"No life or health insurance contract upon an individual, except a contract of group life insurance or of a group or blanket health insurance shall be made or effectuated unless at the time of the making of the contract the individual insured, being of competent legal capacity to contract, *applies therefor, or has consented thereto in writing*[.]" (emphasis added).

The statute makes exception for insurance "effectuated": (1) by one spouse on the life or health of the other, § 371(a)(1); (2) by a person with an insurable interest in a minor, or upon whom the minor is dependent, on the life "or pertaining to" the minor, § 371(a)(2); (3) by the parents or step-parent, by way of a family policy on two or more family members, § 371(a)(3); and (4) by a person with an insurable interest on the life of a person legally incompetent to consent to such insurance. § 371(a)(4).

Section 371, along with four other sections concerned with insurance applications and another, present § 366, addressing insurable interests, became a part of Maryland law in 1956 when Governor McKeldin signed Senate Bill 13 into law. *See* Ch. 47 of the Acts of 1956. It was originally codified as Md.Code (1957) Art. 48A, § 168(a). Enacted because it was "necessary for the protection of the general public," *see* Legislative Council of Maryland, Report to The Gen. Assembly of 1956: Proposed Bills, at 55 (1955), § 371 has been amended on several occasions, but it has not been the subject of judicial interpretation.

The policy underlying statutes similar to § 371, *e.g.* Ark. Code Ann. § 23–79–105 (Michie 1987 & 1992 Cum.Supp.); Ga.Code Ann. § 33–24–6 (Michie 1990 & 1992 Cum.Supp.),[4] has been addressed by courts in other jurisdictions. *See Callicott v. Dixie Life & Accident Ins. Co.*, 198 Ark. 69, 127 S.W.2d 620, 622 (1939); *Hunt v. Pyramid Life Ins. Co.*, 21 Ark.App. 261, 732 S.W.2d 167, 169 (1987); *Cableton v. Gulf Life Ins. Co.*, 12 Ark.App. 257, 674 S.W.2d 951, 952 (1984); *Wood v. New York Life Ins. Co.*, 255 Ga. 300, 336 S.E.2d 806, 809 (1985); *Time Ins. Co. v. Lamar*, 195 Ga. App. 452, 393 S.E.2d 734, 735–36 (1990); *Wren v. New York Life Ins. Co.*, 493 F.2d 839, 841 (5th Cir.1974), *reh'g and reh'g en banc denied*. *See also Ramey v. Carolina Life Ins. Co.*, 244 S.C. 16, 135 S.E.2d 362, 366–67 (1964); William F. Meyer, *Life & Health Insurance Law* § 4:6, at 96 (1972 & 1992 Cum.Supp.). Where such a statute exists, the cases make clear, it is against the public policy of the State to permit one person to insure the life of another, without that person's knowledge or consent. The court in *Wood* explained the rationale underlying the public policy reflected in the statute:

"In the early common law, there was no requirement that the owner of a life insurance policy had an insurable interest in the life of the insured, nor was there any requirement that the insured consent to the coverage on his life. The statutory requirement of insurable interest was intended to prevent wagering on human lives. The insurable interest requirement is inbred with a potential conflict of interest when one with an insurable interest obtains coverage on the insured without the insured's consent. The conflict is that the beneficiary of the policy has both an interest in the insured's continued life (the

---

**4.** Other states with a statute similar to § 371 include: Alaska (Ala.Stat. § 21–42–090 (1991)); Delaware (Del.Code Ann. tit. 18 § 2708 (1974 & 1991 Repl.Vol.)); Louisiana (La.Rev.Stat. Section 22–613(a) (West 1978 & 1992 Cum.Supp.)); New York (McKinney's N.Y.Ins.Law § 3205 (1985 & 1992 Cum.Supp.)); and Pennsylvania (Pa.Stat.Ann. tit. 40, § 152 (1992)).

insurable interest) and an interest in the insured's death (as beneficiary of the policy) . . . [T]his conflict might be a fruitful source of crime. At the very least, it creates a substantial risk to the unknowing insured person.

"As in other cases of conflict of interest, the consent of the party who would be affected by the conflict of interest obviates the public concern since the affected party can best evaluate the risk to his own interest. In the context of life insurance, it was recognized early in our jurisprudence that it is against public policy to procure insurance on the life of another without his consent, even though the insurance was procured by one having an insurable interest. . . ." (citations omitted).

336 S.E.2d at 809 (quoting *Conn. Gen. Life Ins. Co. v. Wood,* 631 F.Supp. 9, 12–13 (N.D.Ga.1984)). The policy thus stems from the perceived need "to avoid extending to the beneficiary the temptation to hasten by improper means the time when he will receive the benefits of the policy." *Id.* The Supreme Court of South Carolina put it thusly:

The rule against insuring policies on the life of a person without his knowledge or consent is "designed to protect human life." Policies issued in violation of this rule "are not dangerous because they are illegal: they are illegal because they are dangerous."

135 S.E.2d at 366–67 (quoting *Liberty Nat'l Life Ins. Co. v. Weldon,* 267 Ala. 171, 100 So.2d 696, 708 (Ala.1958)).

These same public policy considerations underlie § 371.

■ Notwithstanding that she will pay the premium on the policy, the appellee emphatically does not consent to the appellant taking out a policy of insurance on his life. Therefore, the appellant has sought the aid of the court. Although the relief she requests is that the appellee cooperate by taking a physical examination, if one be required, in light of § 371, that relief would be insufficient unless the appellee also consents to the issuance of the policy. Thus, any court order requiring the appellee to cooperate with the appellant's effort to obtain insurance on his life necessarily

must also include the requirement that the appellee "consent" to the issuance of the insurance policy itself. Consequently, this case presents an issue—the very nature of the consent required by § 371—that was not presented in any of the cases uncovered by our research. With the exception of *Ramey,* the cases address, simply, whether consent had been obtained. In *Ramey,* the issue was the foreseeability of an insured's murder by the insurer issuing a policy of insurance on his life to persons with no insurable interest and without the insured's knowledge or consent.

The word "consent" is not a defined term either in § 371 or in the insurance code. To discern its meaning, therefore, we must give the word its natural and usual meaning, *Harford County v. Univ.,* 318 Md. 525, 529, 569 A.2d 649, 651 (1990), not a strained or subtle one, in light, however, of the goal the statute seeks to achieve. *Kaczorowski v. City of Baltimore,* 309 Md. 505, 513, 525 A.2d 628, 632 (1987).

*Black's Law Dictionary,* 276 (5th ed. 1979) defines "consent" as:

[a] concurrence of wills. Voluntarily yielding the will to the proposition of another; acquiescence or compliance therewith. Agreement; the act or result of coming into harmony or accord. Consent is an act of reason, accompanied with deliberation, the mind weighing as in a balance the good or evil on each side. It means voluntary agreement by a person in the possession and exercise of sufficient mental capacity to make an intelligent choice to do something proposed by another. It supposes a physical power to act, a moral power of acting, and a serious determination and free use of these powers ... It is an act unclouded by fraud, duress, or sometimes even mistake.

Willingness in fact that an act or an invasion of an interest shall take place. Restatement, Second Torts, § 10A.

* * * * * *

*See Gray v. Grunnagle,* 423 Pa. 144, 223 A.2d 663, 669 (1966). In *Webster's Third New Int'l Dictionary,* 483 (3rd ed. 1986), it is defined as:

> [c]ompliance or approval esp[ecially] of what is done or proposed by another: acquiescence, permission, capable, deliverable and voluntary agreement to or concurrence in some act or purpose implying physical and mental power and *free action* ... (emphasis added).

■ From the foregoing, it is obvious that consent, in its ordinary signification, contemplates an act done voluntarily. *See Lusby v. State,* 217 Md. 191, 200, 141 A.2d 893, 897–98 (1958); *Matter of Smith,* 16 Md.App. 209, 225, 295 A.2d 238, 246 (1972); *Sanders v. State,* 8 Md.App. 17, 19, 257 A.2d 442, 443 (1969). *See also Marcey v. Marcey,* 130 A.2d 918, 919 (D.C.Mun.App.1957); *Green Giant Co. v. Adcock Distrib. Co.,* 420 So.2d 524, 526 (La.App.1982); *State v. Little,* 270 N.C. 234, 154 S.E.2d 61, 65 (1967); *Johnson v. Johnson,* 104 N.W.2d 8, 12 (N.D.1960). To be voluntary, a "[c]onsent cannot be the subject of compulsion." *Matter of Smith,* 16 Md.App. at 225, 295 A.2d at 246. Moreover, although always requiring submission, unlike "assent", which is passive, consent "implies some positive action." *Lusby,* 217 Md. at 200, 141 A.2d at 898. "[I]ts existence depends upon the exercise of voluntary will of those from whom it is obtained." *Matter of Smith,* 16 Md.App. at 225, 295 A.2d at 246. Thus, it implies an act that is the result of "[a] free and deliberate exercise of one's will," *Green Giant Co.,* 420 So.2d at 526, not one that is coerced, *Little,* 154 S.E.2d at 65, or forced. *Matter of Smith,* 16 Md.App. at 225, 295 A.2d at 246. Furthermore, "the one consenting has the right to forbid." *Id. See also Taylor v. Allstate Ins. Co.,* 286 Minn. 449, 176 N.W.2d 266, 270 (1970); *Harding v. Carr,* 79 R.I. 32, 83 A.2d 79, 84 (1951). "[R]espectful obedience to the firm and repeated rulings of [a] trial court", *Bond v. A.H. Belo Corp.,* 602 S.W.2d 105, 108 (Tex.Civ.App.1980), does not suffice and neither does statutory compulsion. *West Point Island Civic Ass'n v. Dover Township Comm.,* 93 N.J.Super. 206, 225 A.2d 579, 581

(1966). And a consent, valid in one context, may not suffice in another, though related, context. *Sanders,* 8 Md.App. at 19, 257 A.2d at 443.

■ Consent, within the intendment of the Legislature when it enacted § 371, presupposes action by the insured that is voluntary. Because it must be unfettered by coercion or compulsion, it necessarily encompasses, and legitimates, the right of the insured to refuse to consent, to forbid, in other words, the issuance of a policy of insurance on the insured's life. This is made evident by the policy underlying the statute, *i.e.* that the insured retain the ability to assess the threat to his or her interest that the issuance of a policy of insurance on his or her life will entail and to decide whether he or she is willing to take that risk.

A court order requiring the proposed insured to cooperate with the efforts of a party with an insurable interest to obtain a policy of insurance on his life can not effect the consent contemplated by § 371. Cooperating, pursuant to a court order enforceable by contempt, with the appellant's efforts to obtain a policy of insurance on his life, is not the appellee's voluntary act. On the contrary, it is, by its very nature and by definition, coercive.

Since the appellant no longer falls within one of the exceptions to the knowledge or consent requirement of § 371 and because the consent required by § 371 must be voluntary, the court properly denied the appellant's motion.

JUDGMENT AFFIRMED.

COSTS TO BE PAID THE APPELLANT.

Concurring opinion by McAULIFFE, J.

McAULIFFE, Judge, concurring.

I concur in the result. I would, however, reach the same result even if Art. 48A, § 371 had not been enacted.